[No. 22761-8-III.   Division Three.   March 22, 2005.]

STEPHEN K. EUGSTER, *Appellant*, v. THE CITY OF SPOKANE
ET AL., *Respondents*.

2

*Stephen K. Eugster*, pro se.

*M.D. (Mike) Williams* (of *Winston & Cashatt Lawyers*), for respondents.

¶1 KURTZ, J. — When a vacancy opened on the Spokane City Council (Council), Rob Higgins, the Council President, circulated a memorandum detailing a proposal for a selection procedure. At one public meeting, Mr. Higgins asked for comments from the Council. At a second public meeting, Mr. Higgins explained the selection procedure, and then assumed that the Council agreed with his proposal because there were no objections to the proposal. Council member Stephen Eugster objected to the informal process used to adopt the selection procedure, and filed this action alleging a violation of the Open Public Meetings Act of 1971 (OPMA), chapter 42.30 RCW. When Mr. Eugster appealed the trial court's decision dismissing his complaint, this court remanded for fact finding to determine whether a "meeting" occurred for purposes of the OPMA. *Eugster v. City of Spokane*, 110 Wn. App. 212, 226-27, 39 P.3d 380 (2002). On remand, the trial court once again dismissed Mr. Eugster's OPMA claim, concluding there was no issue of fact as to whether a meeting took place by a majority of the Council in violation of the OPMA. Mr. Eugster appeals. We conclude there was no violation of the OPMA and, consequently, affirm the judgment of the trial court.

## FACTS

¶2 *Procedural History.* This case arose when Mr. Eugster filed an action against the city of Spokane (City), the Council, and Rob Higgins, Roberta Greene, Phyllis Holmes, and Steve Corker, individually. Mr. Eugster alleged a violation of the OPMA.

¶3 Initially, the trial court dismissed the suit, concluding that no meeting had occurred that resulted in a final action. *Eugster*, 110 Wn. App. at 220. On appeal, we reversed and remanded for additional fact finding as to whether a meet-

ing was held in violation of the OPMA. *Id.* at 232. Specifically, we determined that further inquiry was required to determine whether e-mails sent to Ms. Holmes constituted a meeting for purposes of the OPMA. *Id.* at 224.

¶4 After remand, Mr. Eugster took the deposition of Rob Higgins, but did not request any further discovery. The City moved for summary judgment. The court concluded that no meeting was held in violation of the OPMA. Mr. Eugster appeals.

¶5 *Facts.* In late 2000, a position on the Council became vacant. The Spokane City Charter provides that vacancies are to be filled by a majority vote of the Council, but the charter fails to set forth a selection process. *Eugster*, 110 Wn. App. at 216-17. As a first step, the Council announced the vacancy and requested that interested parties submit their applications prior to December 31, 2000.

¶6 *Development of a proposal for a selection procedure.* At the January 2, 2001 Council meeting, Council members discussed the vacancy during the Council's regularly scheduled legislative session. Ms. Holmes was on vacation over the holidays and was not able to attend this meeting.

¶7 After the January 2 meeting, Council President Higgins met with Ms. Greene and Mr. Corker to discuss ways to resolve issues related to the selection process. This meeting did not involve a majority of the Council members. The discussion between the three Council members resulted in the memorandum dated January 5, 2001, describing a proposed plan for a selection process to fill the Council vacancy. The proposed plan required the Council to review the 62 candidates who had submitted applications and to choose 10 names. After this initial review, a subcommittee would review these names to select a shorter list of candidates who would then be invited to formal interviews by the entire Council.

¶8 *Mr. Higgins's contacts with Ms. Holmes.* Prior to Ms. Holmes's departure for her vacation, she spoke with Mr. Higgins regarding the need to fill the Council vacancy; but

these two Council members did not discuss the selection procedure because the deadline for submitting applications for the position had not passed. On December 27, Ms. Holmes spoke with Mr. Higgins by telephone regarding appointments to the subcommittee. During this conversation, Ms. Holmes mentioned that she had reviewed the applications for the vacancy and that she had started a list of those she felt should be interviewed for the position. Mr. Higgins and Ms. Holmes did not discuss the procedure for filling the vacancy.

¶9 On December 30, Ms. Holmes received an e-mail sent by the Council's administrative assistant regarding the interview schedule for individual candidates. Ms. Holmes responded by indicating that she thought the schedule was fine. Neither of these two e-mails discussed the procedure to fill the vacancy.

¶10 Significantly, Ms. Holmes did not discuss the procedure for filling the Council vacancy with Ms. Greene, Mr. Higgins, or Mr. Corker at any time prior to the January 8, 2001 meeting.

¶11 *January 8 meetings.* Ms. Holmes returned home from her vacation on January 7. On January 8, she attended the Council briefing session and the legislative session—both of which were open to the public.

¶12 Ms. Holmes did not arrive at the Council office until shortly before the first meeting. In those few minutes before the meeting, Ms. Holmes picked up her mail, memoranda, and written materials for both meetings. These materials included the January 5 memorandum from Mr. Higgins. Ms. Holmes did not read the January 5 memorandum describing the proposed selection process until after she arrived at the Council briefing session, which was held during the afternoon of January 8.

¶13 At the briefing session, Council President Higgins brought up the memorandum and stated: " 'I think we've resolved the differences with the majority of the Council.' " *Eugster*, 110 Wn. App. at 217. The memorandum indicated

that Council President Higgins formulated the suggested procedure in a meeting with two other Council members. *Id.* When questioned by Mr. Eugster as to whether the procedure was a new rule, President Higgins stated that: " 'This is a process that we're adopting for the interviews,' " and that " 'I've talked to each Council Member, the majority is in agreement that this is a process that we'll use for this selection process.' " *Id.* at 217-18. Mr. Eugster objected, asserting that Mr. Higgins's statements indicated that he had obtained the consent of a majority of the Council prior to the meeting. President Higgins bypassed these complaints and asked for comments from other Council members. *Id.* at 218.

¶14 At the January 8 legislative meeting, Mr. Eugster restated his objections. Then, Mr. Higgins explained that the procedure to be adopted for the selection process, as outlined in the January 5 memorandum, contained an error in that the Council did not intend to select the new Council member in executive session. *Id.* Later during this meeting, a Council member asked Mr. Higgins to explain the final process and the January 5 memorandum. Mr. Higgins repeated his understanding that the process allowed the Council to discuss the finalists in executive session, but that the vote would be conducted at a public meeting. *Id.*

¶15 In Mr. Higgins's deposition, he explained that he had not had any meetings with a majority of the Council, but merely assumed that all of the Council members were in agreement when they failed to object to the procedure outlined in the January 5 memorandum.

¶16 At the summary judgment hearing, Mr. Eugster admitted that there had been no meeting between Mr. Higgins, Mr. Corker, Ms. Greene, or Ms. Holmes, "by telephone, e-mail or some other method." Report of Proceedings (RP) at 8. Instead, he argued that the court must consider that a meeting took place because there was an "action." RP at 9. In his view, the Council members' failure to object to the memorandum constituted a "secret ballot." RP at 9.

¶17 In reaching its decision granting summary judgment, the trial court determined that Mr. Higgins's assumptions after circulating the memorandum, and Ms. Holmes's silence, did not create an issue of fact that a meeting took place by a majority of the Council in violation of the OPMA.

## ANALYSIS

¶18 "All meetings of the governing body of a public agency shall be open and public and all persons shall be permitted to attend any meeting of the governing body of a public agency." RCW 42.30.030. The purpose of the OPMA is to permit the public to observe the steps employed to reach a governmental decision. *Cathcart v. Andersen*, 85 Wn.2d 102, 107, 530 P.2d 313 (1975). This statute is to be liberally construed. RCW 42.30.910. To prevail on an OPMA claim, the plaintiff must demonstrate that: (1) members of the governing body (2) held a meeting (3) where the governing body took action in violation of the OPMA, and (4) the members of the governing body had knowledge that the meeting violated the statute. *Eugster*, 110 Wn. App. at 222 (quoting *Wood v. Battle Ground Sch. Dist.*, 107 Wn. App. 550, 558, 27 P.3d 1208 (2001)).

¶19 Mr. Eugster contends that the conduct of the Council, in gathering a consensus as to the selection procedure, constituted a secret ballot in violation of the OPMA. He maintains that this court has already determined that the procedure is an action for purposes of the OPMA. By making this argument, he attempts to avoid any discussion as to whether a meeting took place, and jumps ahead to the argument that this action by the Council is null and void because it was adopted by secret ballot.

¶20 In making this argument, Mr. Eugster ignores this court's prior decision. In our decision, we remanded for fact finding as to whether a meeting took place. *Eugster*, 110 Wn. App. at 232. Contrary to Mr. Eugster's assertions, we did not determine that an "action" occurred; instead, we

stated that "had a 'meeting' occurred an 'action' would have occurred." *Id.* at 225.

¶21 *Did a meeting occur for purposes of the OPMA?* Our first inquiry then is whether there is a material issue of fact as to whether a "meeting" occurred for purposes of the OPMA. It is important to note that Mr. Eugster concedes that no physical meeting took place. Instead, relying on RCW 42.30.060(1), he makes the circular argument that a meeting must have taken place because there was an "action."

■ ¶22 RCW 42.30.060(1) provides that "[n]o governing body of a public agency shall *adopt any ordinance, resolution, rule, regulation, order, or directive*, except in a meeting open to the public and then only at a meeting, the date of which is fixed by law or rule, or at a meeting of which notice has been given according to the provisions of this chapter." (Emphasis added.) No meeting takes place, and the OPMA does not apply, if the public agency lacks a quorum. *See Loeffelholz v. Citizens for Leaders with Ethics & Accountability Now*, 119 Wn. App. 665, 701, 82 P.3d 1199, *review denied*, 152 Wn.2d 1023 (2004).

¶23 This case was remanded to the trial court for fact finding as to whether a meeting took place. Mr. Eugster failed to submit evidence demonstrating that a meeting took place. The language of RCW 42.30.060(1) allows the governing body to take some actions without a public meeting. Here, there was no meeting, and no general consensus was obtained, prior to the January 8 public meeting. Mr. Eugster concedes this point in his reply brief, when he states: "In fact, apparently, the collective position was not arrived at or confirmed at least by the Council as a collective position until the time of the council meetings in question." Appellant's Reply Br. at 5.

■ ¶24 *Did the announcement of the procedure constitute a secret ballot?* Mr. Eugster next argues that the procedure announced by Mr. Higgins constituted a secret ballot, which also constituted a meeting for the purpose of

the OPMA. To support this argument, Mr. Eugster relies on RCW 42.30.060(2) and .020(3).

¶25 RCW 42.30.060(2) provides that: "No governing body of a public agency at any meeting required to be open to the public shall vote by secret ballot. Any vote taken in violation of this subsection shall be null and void, and shall be considered an 'action' under this chapter." But, the Council did not take a secret ballot at a meeting that should have been open because there was no meeting between a majority of the Council prior to the open meetings held on January 8. Moreover, the meeting where Mr. Higgins announced the procedure was an open meeting where the public was able to object to the procedure and/or the process.

¶26 Mr. Eugster maintains that a collective decision was reached by secret ballot at the public legislative meeting because the announcement of the procedure—and the Council's failure to take action—constituted a secret ballot in violation of the OPMA. To support this argument, Mr. Eugster relies on *In re Recall of Lakewood City Council Members*, 144 Wn.2d 583, 586-87, 30 P.3d 474 (2001).

¶27 In *Lakewood*, the petitioners argued that city council members violated the OPMA by meeting in a closed session with the city manager and the city attorney to discuss a lawsuit against the city council. *Id.* at 585. The trial court concluded that no prohibited action had been taken and that no vote had been taken. As part of its decision, the court in *Lakewood* noted that the city manager had the authority to make the decision even without the approval of the city council. The court also determined that the challenged discussion was protected by the attorney-client privilege. *Id.* at 587.

¶28 Here, Mr. Eugster attempts to distinguish *Lakewood* by arguing there was an action and that, unlike *Lakewood*, this case involves a decision that only the Council could decide. But *Lakewood* does not support Mr. Eugster's position.

¶29 First, the Lakewood city council made the challenged decision in a closed session. *Id.* at 585. Here, no meeting took place outside the open Council meetings. Second, in *Lakewood*, the court rejected the argument that the council voted in executive session by failing to block the city manager's decision to join the lawsuit. *Id.* at 587.

¶30 Mr. Eugster argues that Mr. Higgins's announcement of the proposed selection procedure constituted a vote. But this statement took place at a public meeting and there was no tally of votes. Moreover, the policy behind the prohibition of secret ballots is to prevent public officials from avoiding public scrutiny and accountability. *See Esperance v. Chesterfield Township*, 89 Mich. App. 456, 463, 280 N.W.2d 559 (1979). Here, there was no attempt to hide the identity of those members supporting or rejecting the procedure.

■ ¶31 Mr. Eugster also contends that the collective position of the Council was not reached until the legislative meeting and that a violation of the OPMA occurred because no formal ballot was taken to validate the Council's decision.

¶32 This argument applies an unreasonable reading of the OPMA and its underlying policy. The OPMA's purpose is to permit citizens access to an agency's decision. A governing board may reach the type of decision made here by an informal procedure when the matter is brought up at a public meeting and it is obvious which member of the board agrees or disagrees.

¶33 In summary, there was no secret meeting and no secret ballot. Based on this record, Mr. Eugster has failed to demonstrate material facts establishing a violation of the OPMA. Mr. Eugster seeks attorney fees under RCW 42.30.120(2). We deny Mr. Eugster's request because he has

not prevailed on his OPMA claim. The judgment of the superior court is affirmed.

SWEENEY, A.C.J., and BROWN, J., concur.

Reconsideration denied June 21, 2005.

Review denied at 156 Wn.2d 1014 (2006).